Filed 2/22/22  P. v. Anderson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

|  |  |
|---|---|
| THE PEOPLE, | C091643 |
| Plaintiff and Respondent, | (Super. Ct. No. P19CRF0020) |
| v. | |
| SHANNON LEE ANDERSON, | |
| Defendant and Appellant. | |

A jury found defendant Shannon Lee Anderson guilty of making criminal threats. On appeal, defendant asserts the conviction should be reversed because:  (1) there was insufficient evidence to support various elements of the offense; and (2) the trial court abused its discretion under Evidence Code section 352 when it admitted a text message into evidence.  We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Charges, Verdicts, And Sentencing*

Defendant was charged with: (1) making criminal threats against M. F. on November 26, 2018;[1] (2) three counts of willfully inflicting corporal injury resulting in a traumatic condition on M. F., who was then his dating partner; (3) committing felony vandalism by damaging M. F.'s vehicle in an amount over $400 in a grocery store parking lot on November 26; and (4) five counts of misdemeanor disobeying a protective order. The jury found defendant guilty of the criminal threats, vandalism, and disobeying a protective order counts, and found him not guilty of the remaining counts.

The trial court found true that defendant had two prior strike convictions and sentenced defendant to 25 years to life for the criminal threats conviction, a concurrent two years for the vandalism conviction, and a concurrent one year for each of the misdemeanor disobeying a protective order convictions.

Defendant challenges only the criminal threats conviction on appeal.

II

*M. F.'s Testimony And Prior Statements*

A

*M. F.'s Trial Testimony*

Defendant and M. F., a marriage family therapist and mental health clinician, had a tumultuous and toxic romantic relationship, which sometimes included physical altercations. As a result of a physical altercation between them on August 20, M. F. was arrested for committing domestic violence against defendant. M. F. thereafter obtained a restraining order against defendant, which was served around October 30. M. F. testified

---

[1] All further date references are to 2018 unless otherwise specified.

she obtained the restraining order because she was concerned she would be charged with felony domestic violence. M. F. did not want to get a restraining order against defendant, but her mother -- with whom she has a strained relationship -- insisted.

On November 26, M. F. had a phone conversation with defendant while she was driving to the grocery store. M. F. told defendant she was having a relationship with someone else. She also likely told him during that conversation that she had learned the other person had a sexually transmitted disease. She told defendant because she had "an outbreak of viral herpes" and she was still intimate with defendant as well. Defendant was upset and angry, which M. F. described to James Applegate, an investigator employed by the El Dorado County District Attorney's Office, as a "Shannon rage."

While M. F. was in the grocery store, defendant came up behind her and grabbed her hair. M. F. was concerned "because there was a restraining order in place and [she] didn't want that to negatively impact [defendant] or [herself]." The prosecution showed M. F. various video recordings taken inside and outside the grocery store. In one of those video recordings, defendant and M. F. were standing in the grocery store parking lot. Defendant hugged M. F. and, as M. F. described her response in the video, she "abruptly moved away from him."

When M. F. returned to her car, she noticed there were scratches on the driver's side of the car. She testified she had previously identified defendant as the person who vandalized her car at the grocery store, after reviewing a video recording taken in the grocery store's parking lot.

M. F. denied that defendant ever made threats against her life or threatened to strangle her or "choke [her] out." Defendant did, however, in May threaten to call her work and ruin her reputation. Although M. F. was aware that defendant had called her work, she did not know what he told her coworker(s); she also did not remember telling El Dorado County Deputy Sheriff Bryan Graf that defendant informed her coworkers

3

about mental health problems M. F. had.  M. F. testified she has never been afraid of defendant during their relationship.

M. F. testified she previously lied when she told:  (1) Investigator Applegate that defendant had threatened her life, threatened to strike her, and threatened to "choke her out"; and (2) El Dorado County Deputy Sheriff Eden Hendley that, as M. F. was getting to the grocery store, defendant was threatening to strangle her.  M. F. further testified it would not be true if she:  (1) told a detective she was "absolutely scared of [defendant] being [at the grocery store]"; (2) told Deputy Hendley defendant had threatened her life; (3) told Deputy Graf defendant had threatened to strangle her or "choke [her] out" and his constant threats caused her to fear for her life; or (4) told Deputy Graf defendant's attempt to ruin her reputation at work caused her to believe he meant the threats he had made against her life.

M. F. confirmed, at the preliminary hearing, she testified defendant had threatened her prior to her entering the grocery store on November 26, and specifically that he had threatened to strangle her.  M. F. testified at trial she lied during the preliminary hearing because she was weak and vulnerable and wanted to preserve herself.

M. F. was engaged to defendant at the time of trial.

B

*M. F.'s Prior Statements*

The jury heard a voice recording of M. F.'s prior interview with Investigator Applegate and others.  During that interview, M. F. told Investigator Applegate that, on November 26, defendant called her in "a Shannon rage" shortly before she arrived at the grocery store, saying he was going to kill her and the person she was dating.  She explained defendant said, "either like I'm going to kill you or cut -- slit your throat, something, strangle you, something."  When asked whether she was fearful when she received four to five threats from defendant between August and the date of the interview, M. F. responded:  "Yeah, I was -- I mean I am fearful of them.  Like I --

4

especially like when they first started. Shannon would get mad, but not like make threats like that. Uh -- so, like I just continued to see like his anger escalate. Uh -- like I said, I don't know what -- what he's capable of. And I don't even really -- I -- I try to like avoid that like level of anger with Shannon. Um -- like I said, yeah, I was."

M. F. further stated during the interview that, after the phone call with defendant ended, she went into the grocery store. She was startled and "freak[ed] out" when defendant pulled her hair in the store; she was in "fight or flight mode or something." Defendant followed her around the store and then out to her car. M. F. did not want defendant to make a scene. Defendant tried to hug and kiss her and she was "kind of like playing along" until she saw the scratches on her car. M. F. thought to herself "what am I doing?" and then quickly got into her car, locked the door, and drove away.

### III

### *Other Evidence*

Deputy Graf testified M. F. told him defendant had threatened to "choke her" and she was in constant fear of him. M. F. further told him that defendant "previously threatened to contact her work to ruin her representation [*sic*], and that he followed through by revealing some deep secrets that she had of her past, mentioning mental health issues amongst other things." She said "[t]hat caused her to believe that if he would follow through with that threat that he would most likely follow through with other threats he made to her."

During cross-examination, defense counsel asked Deputy Graf: "Now [M. F.] was never able to tell you in exact words what the threats were that Mr. Anderson was making to her, was she?" Deputy Graf responded his report included two quotes that M. F. said defendant "would either threaten to slit her throat or choke her out." Deputy Graf testified, however, that M. F. never described a particular date or time when such statements were made.

5

Deputy Hendley testified M. F. told her that she received a phone call from defendant on her way to the grocery store and "he was talking about strangling her and making vague threats." During cross-examination, after refreshing her recollection with a transcript, Deputy Hendley clarified: "She said that he was making threats to kill me and he kind of just rants and raves so nothing ever really specific. And she did say that that day he seemed aggressive." Defense counsel asked: "So what she said in context was he was making some threats, but she couldn't be really specific as to exactly what he was saying, right?" Deputy Hendley responded, "Correct." During redirect, Deputy Hendley testified M. F. said she believed defendant was capable of carrying out his threats to her and she was scared.

During recross, Deputy Hendley further confirmed that, when she asked M. F. "what he was doing," M. F. responded: " 'No, he was just ranting and raving. And honestly it makes no sense to me at the time. He just means -- I tell him I'm not going to be together with him. He's just, like, I'm gonna kill you, you know, you know, I'll kill you. I'm gonna strangle you, I think he said.' "

M. F.'s mother testified M. F. called her following the grocery store incident and told her defendant had approached her from behind, followed her around the store, and "had threatened to kill her at that time . . . ." M. F.'s mother described M. F. as "very shaken up" when they spoke.

The trial court admitted into evidence a text message sent on November 27 (the day after the grocery store incident), from defendant to an individual identified as "babymama" on his cell phone, stating: "Yes, he does. I'm still fucked up from being fucked up from [M. F.]. She keeps on digging in, telling me about her boyfriend, saying stupid shit. I hate her fucking guts. I want to kill her." M. F. testified "babymama" is the mother of defendant's two youngest children.

6

DISCUSSION

I

*The Trial Court Did Not Abuse Its Discretion In Admitting The Text Message*

Defendant argues the trial court erred in admitting into evidence the text message he sent to "babymama" because it was more prejudicial than probative under Evidence Code section 352. We disagree.

A

*Additional Background*

Defendant objected to the admission of the text message arguing, among other things, the content was highly prejudicial under Evidence Code section 352, could be taken out of context, and was "misleading as to [defendant's] state of mind on the dates and times in question in the complaint." The prosecutor responded the text message was probative because it corroborated defendant's "state of mind as to wanting to kill [M. F.]." The prosecutor explained: "So far we only have the victim's testimony that [defendant] had never threatened to kill her. She obviously said multiple different things to different deputies and that he actually did threaten to kill her. And so a statement from the defendant himself could not be more probative in this case. The prejudicial effect would have to be astronomical."

The trial court found the text message was "tremendously probative." The court explained the text message was sent the day after the alleged criminal threat was made. Thus, the trial court ruled: "It is very probative of his state of mind. It's very probative of his animus, at least at that time, as to the alleged victim. And whatever prejudicial value there is certainly does not outweigh the probative value of this evidence."

B

*The Text Message Was Probative And Not Unduly Prejudicial*

Pertinent to defendant's argument, Evidence Code section 352 provides the trial court "may exclude evidence if its probative value is substantially outweighed by the

7

probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We review a challenge to a trial court's choice to admit or exclude evidence under [Evidence Code] section 352 for abuse of discretion." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

As to the probative value of the evidence, defendant argues the text message "sent a day later could not possibly prove [his] state of mind at the time the threat was allegedly made, nor could it establish that [he] 'intended that his statement be understood as a threat.' " The People argue the evidence was probative of defendant's state of mind the day before because defendant wrote he was "still" upset about his conversation with M. F. and so angry about it that he wanted to kill her. Evidence is probative when it " 'tends logically and by reasonable inference to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution's case, and is not merely cumulative.' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 739-740.)

The key issue in this case was which version of the events was true -- i.e., M. F.'s trial testimony that defendant did not threaten her or her prior statements to the various witnesses that he did. The text message demonstrates defendant was *still* upset with M. F. the day after the grocery store incident regarding their conversation "about her boyfriend" and he was so angry he wanted to kill her. Defendant's own words as to his state of mind logically and by reasonable inference tended to prove that M. F.'s version of the events relayed to the various trial witnesses was true -- that is, defendant threatened to kill her after she told him that she was seeing someone else.

As to the undue prejudice analysis, defendant asserts, without providing any analysis, the "message in question could hardly have been more emotion-invoking, or bias-inducing." Defendant fails to explain or analyze, however, how the asserted undue prejudice *substantially outweighed* the probative value of the evidence, as required to render the evidence inadmissible under Evidence Code section 352. We find no basis for

8

concluding the trial court abused its discretion in determining the threshold to exclude the evidence had not been met.

## II

### *The Criminal Threats Conviction Is Supported By Substantial Evidence*

"We review sufficiency of the evidence challenges for substantial evidence: ' " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " [Citation.] "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.] "Evidence is sufficient to support a conviction only if it is substantial, that is, if it ' "reasonably inspires confidence" ' [citation], and is 'credible and of solid value.' " ' [Citation.] Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.]

"[Penal Code] [s]ection 422 provides five elements: '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat -- which may be "made verbally, in writing, or by means of an electronic communication device" -- was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*People v. Roles* (2020) 44 Cal.App.5th 935, 941-942.)

Defendant argues there was insufficient evidence: (1) defendant threatened to commit a crime involving death or great bodily injury to M. F.; (2) "that an unequivocal, unconditional, immediate prospect of execution of a criminal threat to M. F. was made by [him]" (bolding omitted); and (3) M. F. was in sustained fear for her safety. We disagree. Before we delve into the analysis of defendant's specific arguments, we note that we need not and do not address the cases defendant seeks to distinguish and rely upon because they do not present the same facts as in this case. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

Defendant first argues the prosecution failed to introduce evidence of any specific threat he made to M. F. and instead relied on M. F.'s statements to others describing general threats and defendant's general " 'ranting and raving.' " Defendant believes the surveillance videos at the grocery store, in which defendant "was seen running after M. F. in the market, tugging on her hair, and then hugging her," further belie "the notion that, only minutes before, [defendant] was so angry he was seriously threatening to kill M. F." Defendant's argument is dependent on viewing the evidence in the light most favorable to himself, which is improper. The evidence must be viewed, instead, in the light most favorable to the verdict. (*People v. Manriquez* (1999) 72 Cal.App.4th 1486, 1490.)

During her interview with Investigator Applegate, M. F. said defendant threatened her while she was driving to the grocery store, saying he was going to kill her and the person she was dating. M. F. explained defendant said "either like I'm going to kill you or cut -- slit your throat, something, strangle you, something." M. F. further confirmed she testified at the preliminary hearing that defendant had threatened her prior to her entering the grocery store on November 26, and specifically that he had threatened to strangle her. The jury was entitled to believe the foregoing statements and to disregard M. F.'s recantation of these statements at trial.

10

Consistent with the foregoing statements, M. F. told witnesses that defendant had threatened to kill her or cause her great bodily injury on November 26. She told her mother that defendant said he was going to kill her, and Deputy Hendley that defendant said " 'I'm gonna kill you' " and she believed defendant also said " 'I'm gonna strangle you.' " Deputy Graf further quoted M. F. as saying defendant threatened to either "slit her throat or choke her out." While Deputy Graf testified M. F. never described the particular date or time when such statements were made, M. F.'s statement to Deputy Graf was consistent with M. F.'s statement to Investigator Applegate that defendant said he would "slit [her] throat" on November 26.

The foregoing testimony taken together and viewed in the light most favorable to the judgment constitutes substantial evidence defendant articulated a threat "to commit a crime which w[ould] result in death or great bodily injury" to M. F. (Pen. Code, § 422, subd. (a).) It is of no legal import that M. F. was unable to recall defendant's exact words when she relayed the threat to others or that some witnesses testified M. F. did not identify a specific date and/or time when the threat was made. Further, M. F.'s description of her conversation with defendant as him "ranting and raving" does not eviscerate defendant's threat to kill her or otherwise cause her great bodily injury.

Defendant next argues the threat was not unequivocal, unconditional, immediate, and specific, reasserting "the witnesses could not so much as agree on what threat was made," M. F. categorically denied at trial that defendant had threatened her, and the surveillance video at the grocery store belied the inference that any threat had been made. The testimony discussed in addressing the foregoing argument supports the jury's finding the threat to kill or cause great bodily injury to M. F. was unequivocal, unconditional, immediate, and specific. We further note defendant's interpretation of the circumstances surrounding the incident ignores other evidence in the record. Indeed, during the phone conversation between M. F. and defendant on November 26, defendant was upset and angry after she told him she was having a relationship with someone else. Defendant

11

then vandalized M. F.'s car in the grocery store's parking lot and a video recording showed M. F., as she described it, "abruptly move[] away" from defendant when he hugged her in the parking lot. In her interview with Investigator Applegate, M. F. further said she was startled and "freak[ed] out" when defendant pulled her hair in the grocery store; she was in "fight or flight mode or something." The circumstances surrounding the threat, when viewed in favor of the verdict, thus supports rather than undermines the verdict.

Finally, defendant argues there was insufficient evidence M. F. was in sustained fear for her safety because: "her cell phone records reflected hundreds of calls to [defendant] after the alleged threat on November 26, 2018"; M. F. and defendant "lived in the same neighborhood, and they saw each other on a regular basis, even after a restraining order was in place"; and the surveillance video at the grocery store did not reflect that M. F. was in fear. Defendant again views the evidence in the light most favorable to himself, which is improper.

M. F. told Deputy Graf defendant had threatened to choke her and she was in constant fear of him. She further told Deputy Graf the fact defendant had previously followed through on his threat to ruin her reputation at work caused her to believe he would follow through with the other threats he had made to her. M. F.'s mother testified M. F. was "very shaken up" when they spoke about the November 26 incident, Deputy Hendley testified M. F. said she believed defendant was capable of carrying out the threats he made to her and she was scared, and the jury heard M. F.'s own statement to Investigator Applegate that she was fearful of defendant's threats. The foregoing coupled with the following facts support the jury's finding M. F. was in sustained fear for her safety: defendant followed M. F. to the grocery store and vandalized her car in the parking lot after the phone call; M. F. was startled, "freak[ed] out," and in "fight or flight mode or something" when defendant pulled her hair in the grocery store; and a video

12

recording showed M. F. abruptly moved away from defendant when he hugged her in the grocery store parking lot.

Finding no merit in defendant's arguments, we conclude substantial evidence supports the jury's criminal threats verdict.

DISPOSITION

The judgment is affirmed.




/s/                         

Robie, J.

We concur:



/s/_____

Hull, Acting P. J.



/s/_____

Earl, J.